Good morning, Mr. Cohen. Come right up. I neglected to rise when the court appeared. I noticed that none of you noticed it, but I do apologize for that. I somehow spaced out. I apologize. It's a matter of little moment, Mr. Cohen. Fire away. The more recent appeal in this case, as your Honor knows, there's two consolidated appeals, involves the juror's answer of no, juror number six's answer of no during the polling of the jury. Our position on that issue is succinctly put in a supplemental authority that we filed last week that notes that audio recordings are relied on by courts of appeals, and in this case, courts across the country really. In this case, the audio recording is clear, the juror says no, and this court can rely on that. The no answer doesn't come out of nowhere. The jury here had been deliberating for a day and a half nearly for a case that was tried for only a day and a half. It had been sending out notes during deliberations indicating that it was at a deadlock with jurors. Let me ask you how we review the decision of the district court with regard to correcting the transcript to make sure that it's accurately reflected. There's an old case that it appears that we're still bound by it. It's an old Fifth Circuit case decided in 1971, United States v. Moore. This case says that we rely on the district court to determine the record when it needs to be corrected absent a showing of, and here are the critical words, intentional falsification or plain unreasonableness. That's a pretty high bar, isn't it? Can we say that Judge Middlebrook's determination was plainly unreasonable or that he intentionally falsified the record in this case after making credibility evaluations? He conducted an evidentiary hearing. He listened to the recording. He examined the Steno notes. He made credibility evaluations. How do we say that Judge Middlebrook's intentionally falsified the record or that his decision was plainly unreasonable? That's a pretty high standard that you have to overcome, isn't it? Let's stay with plain unreasonableness. We have not discussed intentional falsification here. As it happens, the second standard – I take it you agree with Judge Wilson that the standard laid out by the former Fifth Circuit in that case is binding precedent. Your Honors, allow me before going into the standard of review. I believe this record is so strong that we can meet the plain unreasonableness standard if that's the standard that Your Honors feel is applicable here. Well, are you disputing that that's the controlling standard? I think we need to step back for a second and recognize that there are very, very few cases that address this. The case Judge Wilson, as he just noted, is the Fifth Circuit in 1971. I bet most of the people in this courtroom were not born in 1971. Sotomayor, to get to the heart of the matter, your argument is that the judge's decision is plainly unreasonable? That's the standard you want to apply. You didn't falsify the record. Your argument is that his decision was plainly unreasonable? That is correct. When you add up the audio recording, which is very clear, the contemporaneous notes of the court reporter, which are very clear, and she even made a note to herself again and again that the juror had answered no, and the fact, as I just noted, that the no answer doesn't come out of the blue. It comes after a deadlocked jury. The fact that the court reporter appears to be the only person in the entire courtroom that heard a no. The judge, who was clearly listening to every juror, heard yeses from everyone. The courtroom deputy heard yeses. There were two prosecutors at the table, and when a jury is being polled, everybody is listening carefully to the jury, yet no one reacted. No one heard a no other than the court reporter. Right. Well, the court reporter is the person who was charged with listening carefully. She was sitting most closely to the jury. That's her job that she's focused on. It's the judge's job, too, right? Well, actually, come to think of it, Your Honor, the judge really, in that case, is waiting for the parties to react. I mean, the judge is not in charge in that situation. It's the – as the defense counsel, who did hear the no on the recording, said, you know, the defense counsel becomes – You don't think a district judge has an obligation to blow the whistle as the jury is being polled? The foreperson comes in and says, we've got a unanimous verdict. Here's the verdict form. The judge turns to the courtroom deputy and says, read the verdict and poll the jury. Jury number one, is that your verdict? Yes, two, yes, three, yes. And you come to number five, and number five says, nope, that's not my verdict. You don't think the federal district judge has an obligation at that point to say or do something? Like saying the jury verdict has to be unanimous. In the absence of unanimity, I'm going to send you back into the jury room to continue to deliberate. Wouldn't that be the clear obligation of the judge? I haven't seen a case that says that, so I can't answer the question. I will say this. For some reason, the judge apparently missed it because it's very clear in the recording. It's very clear in the Steno notes. Your answer is in the absence of controlling case, that's not the obligation of a federal judge. Well, I'd want to think about it a little, Judge. Of course, the way you put it, the answer is temptingly yes. But at the same time, it's the defense counsel who typically in our adversary process reacts to events that happen in the courtroom and makes motions and objections. So I am not confident. I accept that the system is adversarial, but that does not denude the judge of his own obligation. Well, that might explain, Judge. I mean, the lawyer might be asleep at the switch. I don't know. It seems to me if a juror says, no, it's not my verdict, the judge is not in a position to accept that verdict at that time regardless of what the other seven jurors say thereafter and regardless of what the first four jurors said at the outset. You're very persuasive, Judge. So I'll agree with you. And unfortunately, that might explain. I mean, there's a lot to argue about, but I don't know that I would stake my fight over that principle. Agreed. And that might explain why Judge Middlebrooks here, knowing that one could say he had an obligation to do something, is frankly bending over backwards in terms of his projecting his preference, frankly, for what happened to what the record shows happened and the way he— came back and said, I didn't say no. I said, yes, that's my verdict. Right. And we address in the brief the problems with that, Judge. I was not allowed to question the jurors on any aspect of their recollection. To say that they were credible is not even possible because there was no cross-examination. And adding to the fact that it is, as we take it, a judge does not have the authority to simply recall jurors a year after a verdict and start questioning about what happened here and what happened there during the trial. We only have a couple minutes left. I actually think your strongest issue is the first issue, the sufficiency of the evidence, because spent shell casing is not ammunition. If you haven't argued that, do you want to devote some time to that argument? Sure. The problem, if you look at the plain language of the statute, it's really – it looks at ammunition that's designed for use in a firearm. And a spent shell casing cannot, cannot be used in a firearm. It's spent. It is no longer capable of being fired. No other court has said that, right? That's right, Your Honor. But no other court has said no. What do we do with the testimony by the agent from the Treasury Department's Bureau of Alcohol, Tobacco, and Firearms who got on the witness stand and said a shell casing qualifies as ammunition within the meaning of the statute? What do we do with that? I don't think an expert's testimony on the law should influence – is actually permitted to influence a judge's reading of a statute. You read the statute. You determine the law. That's the role of appellate courts. You didn't object to the jury instruction that instructed the jury that a spent casing was ammunition, right? That's correct, Your Honor. But the argument on appeal is not an objection to a jury instruction. It's an objection to the government's theory throughout, including what Judge Wilson was just saying a moment ago, having an expert testify that a spent shell casing constitutes ammunition, and its argument to the jury focused on the spent cartridge casing. That obtained a conviction. Was the government's proof limited to that? Could it not establish beyond a reasonable doubt the sufficiency of the evidence from a series of other pieces of evidence, including the statement by the defendant that he sprayed the place from the car, from the fact that the bullets appear to have been shot from within the car, through the car, outside the car, from the 911 calls? There were two of them. Wasn't there sufficient extrinsic evidence to permit a jury to infer beyond a reasonable doubt the possession of ammunition independent of whether you say a spent casing falls within or without the ambit of the statute? Let me give two answers to that. The first, I see I'm over my time. That's all right. You take your time. You're answering our questions. The first one is the legal one. It's that if you look at the Schatz case, which is a very important case, which we submitted in supplemental authority, citing Griffin, in Schatz, there was also plenty of evidence that the defendant had, Schatz said, property, I'm sorry, a license issued by Alabama is not property. I'll be brief, Judge. That's all right. Your court said, no, that's incorrect. An Alabama license is not property. Therefore, fraud was not proven because property is an essential element of fraud. So the government came back along the lines, Judge Marcus, that you were just saying, saying, well, we have plenty of evidence in the record that this defendant stole money. And this court said, yeah, but your theory was that he stole property, not money. So we can't, as an appellate court, go back and look through the record and find sufficient evidence. You presented— Is it your argument that there was insufficient evidence to establish that he possessed ammunition independent of the spent cartridges? Or is it your argument that, no, there was enough to take that to the jury, but they didn't argue it? Or is it your argument that they didn't properly plead it in the indictment? I'm not sure I have the thrust of your argument. The indictment was fine. The indictment charged possession of ammunition. That we can all agree on. The problem was that if, say, those spent shell casings had been in my client's car, not as a result of his firing a weapon, but they were just in the car. They'd been there before. They got there somewhere, somehow else. The jury was never asked to make the critical determination that the government now says in its brief was its theory. Did my client fire that live ammunition? And that is what's missing from this case. We don't have that critical conclusion to validate this conviction. Thanks. You reserve five minutes and you'll have your full rebuttal. Good morning. Good morning. May it please the court, counsel. Shannon Shaw on behalf of the United States. With me at counsel table is Assistant United States Attorney Maisha Darrow. She was the trial prosecutor on this matter. Unless the court directs otherwise, I'll begin discussing the sufficiency of the evidence. That's what Judge Wilson indicated was the key issue for him. The government has a strong argument on this. What was the theory that the government presented to the jury? It was simply that a shell casing is ammunition, period. Is that right? No, Your Honor. The theory that the government presented, and this is what's charged in the indictment, and this is what makes our case different from the case cited by defense counsel in his recent notice of supplemental authority. The indictment charged possession of ammunition by a person who'd been convicted of a felony, and this ammunition affected interstate and foreign commerce. In the case cited by defendant, the Schatz case, the indictment specifically charged business licenses or property. And that's why the appellate court said, hey, you can't change your theory now because you said in the indictment, X, Y, and Z, business licenses or property. Here in our indictment, we charge that Wilcher possessed ammunition. And what the United States did was- The indictment did not reference spent cartridges. Correct, Your Honor. And so when we came into court, the trial prosecutor stood up. She said, ladies and gentlemen, what we have here is a video. We have a video showing Willie Wilcher. He's in a convenience store. He's waving around an AK-47. What he does with that AK-47 is he tells the people in the store, hey, tell those guys from the projects that Pee Wee's looking for them. Pee Wee's here if they want to find me. And what do we have next? We have him getting into a gray car, and the surveillance video shows this. The government presented testimony. That was the first thing they presented. They presented testimony of that surveillance video. Willie Wilcher gets into the car. He tucks the firearm behind his back. Two minutes later, two police officers in two different locations testify that they heard shots fired. They're in the area. They're in Liberty City. They respond within a couple minutes. When they get to the scene where the shot spotter had indicated the shots had come from, a bystander comes up. The bystander said, Pee Wee just shot up pork and beans for no reason. And there's testimony that Pee Wee was the only name that Willie Wilcher had used, and he had identified himself as Pee Wee in the security video and the surveillance video. So here we have a bystander who's saying, Pee Wee just shot up the pork and beans for no reason. The officers looked in the area. They said, okay, what evidence do we have that Wilcher was shooting? And they find spent shell casings. And crucially, the spent shell casings, they're not from a 9mm. They're not from a .45. They're from an AK-47. And there was testimony about that on the record. So here we have the defendant on a video holding an AK-47. We have shots fired. We have a bystander saying, Pee Wee shot up the pork and beans. And we also have two 911 calls. Those 911 callers. And that was the theory presented to the jury that he must have had a shell casing. He must have had ammunition because we've got all this evidence that he fired the shot. Correct, Your Honor. That's the theory that was presented to the jury? Correct. And I think it's also telling that the defense counsel is making arguments. What was the instruction that was presented to you? The instruction was the pattern jury instruction. To be convicted of a violation of 922G, you need to show that there was ammunition, that it traveled in interstate commerce, and that the defendant had been convicted of a felony. Here the shell casings give us that nexus. That's why it's important for the district court to have the shell casings. If we didn't have shell casings, the government couldn't have charged the case because there would be no nexus to interstate commerce. So that's what the shell casings do. And as I was mentioning, defense counsel, their whole closing was there was a shooter. There was a shootout. Willie Wilcher wasn't that shooter. And the defense wouldn't have focused so hard on trying to show the jury that Wilcher wasn't the shooter if they didn't see the evidence as showing that he had fired the weapon which left the shell casing. So he was guilty of the crime because there was sufficient evidence that he possessed ammunition because he had a spent shell casing? Yes, there's sufficient evidence that he possessed ammunition because the government presented testimony that he had had a firearm, that he shot the firearm, that their left spent shell casing. So it wasn't simply because he had a spent shell casing, correct? Correct. The casing was evidence of commerce. Correct. But the casing was not, just if I could finish for a second, evidence of possessing ammunition, at least not alone. It was other evidence that he possessed ammunition. Yes, Your Honor, there was extensive evidence. The government put on ten witnesses. Then what was the need of the evidence from the expert that a shell casing constitutes ammunition and the jury instructions specifically directing the jury's attention to the shell casing? There are multiple theories on which a defendant can be convicted, and I think that the reason for that is to give the jury the whole picture. There is a strong argument that shell casings standing alone are ammunition, and the only appellate court to address that is the First Circuit. The First Circuit directly held that when a defense counsel said spent shell casings are not ammunition, the district judge stepped in and said, jury, I'm not going to tell you about the facts, but the law is that spent shell casings are ammunition. That's the only case we have directly on point where an appellate court directly addressed that. But I wanted to go back to Judge Wilson's question to you. In closing argument to the jury, did the prosecutor argue in words or substance the defendant possessed ammunition? He couldn't do it because he was a convicted felon, and we know that he possessed it because, among other things, he told us that he sprayed the place with his firearm. We know it because, in fact, there were bullet holes that suggested that the shots were fired from within the vehicle to outside. We know it because there was 9-1-1 testimony that shots had been fired from that car where he was seen later running, and we know it because, in fact, there were spent casings in the car. Was that argued in words or substance, or was it argued simply as spent shells, therefore he possessed ammunition? It was argued in substance, Your Honor, and I can direct the court to some of those lines in the transcript. We have the government saying in opening close on docket entry 58, page 134, the government plays the 9-1-1 call, and at the end of the 9-1-1 call, the prosecutor says, That ammunition was possessed by the defendant on December 29th, 2015. Then again, when the government steps up for its rebuttal argument, the first thing the prosecutor says is, On December 29th, 2015, a bully wrecked havoc on the Liberty Square project. The bully got into a rented vehicle and drove down 13th Avenue. That bully sprayed the community with AK ammunition. Why didn't the government, if you had all that evidence, charge him with possession of a firearm by a convicted felon? Yes, Your Honor, and that again goes to the nexus requirement that we must prove under 922G that the firearm or ammunition traveled in interstate commerce, and we had testimony about that. Special Agent Ribas from the Bureau of Alcohol, Tobacco, Firearms, and Explosives said that on the stand. He testified, A person cannot be charged federally with possessing a firearm if there was no analysis done on the gun and where the gun was manufactured. That's at docket entry 58, page 13. Here, the government didn't recover the firearm. So the only physical evidence you had was a spent shell casing. Yes, Your Honor, and if we didn't have that, we would have no interstate commerce, and we couldn't have charged ammunition. Let me ask you this question. You see a convicted felon on the street. This is a hypothetical, and he's got a keychain, and he's got a spent shell casing on his keychain. Can you convict him of possession of ammunition by a convicted felon? There's a difference between could convict and would convict. I think in that case, that wouldn't have been a case that's charged. It's not like here where we have somebody who's walking with an AK-47 at 340 in the afternoon where there's kids running around where, you know, it's a community. Right, but he might have bought the spent casing in a novelty store, and you don't know that he possessed ammunition, right? But that's not your case. But how would that make—how could you prove beyond a reasonable doubt that the mere possession of the spent casing alone attached to the keychain indicated that he had possessed ammunition? Right, so in that case, it would be a tough argument to say that that spent shell casing meets the statutory definition needed for ammunition. Any more than if I possessed the stock of a .357 Magnum, and the stock was not operable. You could hardly charge me with being a felon in possession of a firearm, right? Correct. And in this case, we have so much more. Help us with the other issue, the issue that Mr. Cohen began with. Thank you, Your Honor. To turn to that issue— Is the standard plainly unreasonable? The standard is. As Judge Wilson and yourself noted, this is binding precedent in the Eleventh Circuit. It's a Fifth Circuit case from 1971, and there have been no other cases since then to call that into question. And other circuits, in fact, rely upon the Morey case for this standard. It's a tough standard to meet, but did you listen to the audio tape yourself? Yes, Your Honor, and so did Judge Middlebrooks. Did you listen to it? I mean, I listened to it. Yes, Your Honor. Do you hear juror number six say no? You don't hear that on the audio tape? I hear the same thing Judge Middlebrooks hears, which is that the audio is indecipherable. It's not a yes, it's not a no. And here we have extensive evidence— What do you hear when you listen to it? I hear something inaudible or indecipherable. You don't hear a no? I don't hear a no. And Judge Middlebrooks didn't hear a no. And actually, if we look at the U.S. v. Smith case, which is a Fifth Circuit case from 1970, that's the case that defense is relying upon for their clear and convincing evidence standard. What's interesting about that case, and what the government likes about that case, is in that case, what the court did was they called back the jurors to correct the record. And the judge ruled based upon the testimony of the jurors. Of course, when a juror gets called back a year or two later with all that pressure, did you say yes or did you say no? The critical determination is what the jurors said at the trial, at the time of the verdict, isn't it? The critical determination is what the jurors said at the time of the trial. And again, I think there's extensive evidence that the jurors said yes. And also, when they came back, Judge Middlebrooks made credibility findings. And those credibility findings are entitled to a high amount of deference from this court. You give them deference, but isn't that the real— I mean, that's why you have an audio recording. So, on review, you can go back and listen to it yourself. If I go back and listen to it and it says no, isn't that enough to establish, well, maybe the decision was plainly unreasonable? What I think is also interesting about the audio is that you don't hear an audible reaction. This is a case where the defendant was facing a significant amount of time in prison, where there had been an al in charge, where there had been a note saying, we have a juror who doesn't want to talk to us. She doesn't want to judge anybody. This is the type of case where maybe you fall asleep during another case. But this is a case where everybody in the courtroom is thinking, okay, what decision did they finally come to? This is not a case—it defies belief that nobody would hear a no in the courtroom and nobody would react. The court reported her to no because that's what she— that's what was put down on the transcript. And her transcript also had some other errors. Her transcript said that juror number seven said no, and the audio is very clear that juror number seven said yes, and juror number seven was the foreperson. There was— There was a stenographer and a court reporter, right? There was two separate people? Only the court reporter is sitting in the room. And then there's a stenographer who records. Isn't that a separate person? Ms. Despensieri is the court reporter, right? There's a scopist, I believe, is the term for the person who translates what the court reporter has typed into the permission. That's a separate person, right? That's a separate person. But Ms. Despensieri certified that that transcript was correct. And we also—we have another error in that Ms. Despensieri didn't record what the judge had said to juror number 12. The judge had clearly— I'm looking at the transcript itself, and it says no on there. For juror number seven. Yeah, it says no for number seven. But the audio is clear that juror number seven says yes. The audio is indecipherable as to juror number six. And I think the case Cabritia v. Moore, which is a published 11th Circuit case from 2000, is instructive here. In that case, the transcript recorded the clerk only asking five of the six jurors if they agreed with the verdict. The court read the entire transcript and concluded that the court reporter simply messed up, that she failed to record the poll of the sixth juror. Just as in this case, the judge instructed the jurors that their verdict had to be unanimous, when the jurors returned from deliberations, the foreperson indicated— In that case, though, the court didn't have an audio to go back and listen to. There's nothing in the decision indicating they had an audio. I'm not sure whether they did or they didn't. Just from the text of the decision, it doesn't mention an audio. In reading it, it appeared more that the court reconstructed it based on the court's memory and based on the fact that nobody reacted. But here we have the additional evidence of the audio and the ability to listen to it and determine what the audio says, right? Correct. But I would make a distinction between this case and the Supreme Court case that defense counsel brought up. In the Scott v. Harris decision from the Supreme Court, it was a 1983 case where there was a denial of summary judgment. It was an excessive force claim. I see my time is up. May I continue my— You may answer the question, sure. Thank you. In that case, a police officer terminated a high-speed chase by applying his rear bumper to Harris' vehicle. The vehicle crashed, and Harris was rendered a quadriplegic. In that case, Harris had said, I was driving in a calm, controlled manner. And a video showed what the court described as a Hollywood-style car chase with the most frightening sort, placing people at risk of serious injury. And the court wrote that when parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, that can't be relied upon at purposes of a summary judgment motion. Here, it's a different situation. We have an audio that Judge Middlebrook said was inaudible or indecipherable, and we have extensive evidence from the juror's testimony, from the reaction of all the parties during the court. This isn't the case where one side is saying this is a calm, clear driving, and another side, the video showing a Hollywood-style car chase. This is a case where we have an audio that's indecipherable, and then we have extensive evidence that no juror said no, that all jurors had said yes. I think the time's got you. Thank you very much, counsel. Mr. Cohen, let me ask you a question about one of the oddities in this case which undoubtedly triggered the whole inquiry in the first place is that the court reporter's transcript is obviously wrong, and the court reporter herself admits that the transcript is wrong because the original transcript, among other things, said juror number seven answered the question no when polled by the courtroom deputy. Is this your verdict? The transcript says he said no. The transcript also doesn't reflect that the district court instructed juror number 12 to answer out loud when juror 12 was being polled as well. So you've got a transcript that says juror number seven, the foreperson, said no. You've got the audio, which unambiguously to everyone's account, has juror number seven saying yes. You have defense counsel having raised nothing at all about the matter at the time that this unfolded. Wasn't there a sound basis for the court under these circumstances to conduct some kind of inquiry to be sure that you had a unanimous verdict? Yes, and I agreed with Your Honor that because a juror said no, the district court had an obligation to follow up on that. That's what Rule 31 says. Okay, so to conduct the hearing was okay. Tell me what, if anything, the judge did erroneously in the conduct of the hearing. Judge, we have a litany of things in our- I take it the essential argument is you didn't get to cross-examine the two jurors. Would that be the most significant from your perspective? That would be certainly one, yes, not being able to cross-examine, I think. Was there something else that was of that significance? He should have been called back in the first place. You mean he could have conducted a hearing, but he should not have called the jurors back to conduct the hearing? That's right, Your Honor. So he should have relied on the testimony of the lawyers, the courtroom deputy, the court reporter, the audio, and his own recollection? His own recollection, as we say in the brief, is problematic because then he starts projecting his own recollection. Right, but I think you're going to find you're on the losing end of that argument given the case law. If the juror had come back, if juror number six had come back and said my answer was no, would you still think it was improper to call the juror back? We'll deal with that issue when we have to. I mean, no, it's a very- I honestly put it in the brief. Hold on. Your suggestion is that it was improper to call the jurors under any circumstances, which you didn't initially object to, and then I know you said that in further research you found it problematic. But really, isn't the juror's recollection pretty important? I don't think so. As Judge Wilson was saying, what matters is what the juror said at that point in time. There are many reasons over the course of a year why a juror- an entire year, by the way, Judge- why a juror would revisit that no answer. And then the question becomes why are we as a system going to drag a juror back and start questioning the reasons why the juror might have changed her mind, her motivations, her contacts, her contacts with the prosecutor, with the judge, with her friends, rethinking the whole case, maybe coming to the conclusion that she hadn't come to the conclusion then that, in fact, Mr. Wiltshire maybe was guilty, but at that point she thought he was not guilty. She didn't agree with the verdict. So there are many, many good reasons not to recall jurors. It's a civic- Right, but the funny thing about it is when the court conducted a telephone conference regarding the wisdom and efficacy of holding an evidentiary hearing and the discussion of jurors came up, the defendant did not express any objection to calling a juror to testify at the hearing. Your Honor, you're right. I did not object at that point, but the judge expressed misgivings, and when I followed up on the research, I found that those misgivings were well-founded. There's a lot of law on why you don't call jurors back to the courtroom. Allow me to address this plainly unreasonable standard that we've been discussing, because, as Judge Howard noted, this is an unusual case. This is a case where you have an audio recording to listen to, where you have stenographic notes, where we had the context of the deliberations, notes being sent out, adamant, not guilty, where we have a hearing and lawyers are testifying. I imagine, I'm not taking a guess here, that this, from your standpoint, Your Honors, is an unusual case, and so this is not a case where the big difference here is we have an evidentiary hearing, which did not take place in Maury, and we have the legal issue of did the judge correctly give the presumption of validity that the statute requires, 753B, to the no answer of a jury. So we have a mixed question of fact and law to which, typically, this court applies de novo review. So if it's the plainly unreasonable issue, I feel we meet that standard readily here. But if Your Honor has doubt, it's unclear whether that standard applies. Very few cases on this, and none involving these particular circumstances or anything close to these particular circumstances. You described the question as whether the trial judge gave the presumption of correctness to the answer of no, generally. Yes. But isn't the actual question whether he gave the presumption of correctness to juror number six saying yes and juror number seven saying no? I mean, it's not just that a juror said no, that the transcript says juror six said yes, and that's actually what you're trying to change, right? And isn't that yes entitled to a presumption of correctness? The fact that there was an error in the transcript, that it was juror number six who said no and not juror number seven, is not the kind of issue that we would be arguing and appealing and having evidentiary hearings over. What matters is did a juror say no? That's what entitles the defendant to a mistrial because it means the verdict is not unanimous. So that's the issue that we feel is before this court. Is there any doubt that the presumption of correctness is a rebuttable presumption rather than an irrebuttable presumption? It's rebuttable, but I think given the strong evidence here, which Your Honors have been asking about, that there was a juror who answered no, that that presumption is not rebutted, that the court reporter got it right, that a juror answered no and her notes are right that it was juror number six. It's unfortunate that it got inverted in the transcript, but her notes are correct. She's correct throughout, except at the very last point where a juror gets misnumbered. Thanks very much, counsel. We appreciate your efforts, and we note, Mr. Cohen, that you're court appointed, and we appreciate you taking on the representation vigorously of your client.